**FILED**

530 New

APR 16 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name **DAViS        Sherman        L.**
       (Last)          (First)         (Initial)

3  Prisoner Number **D-40369**

4  Institutional Address **CSP-Corcoran Prison - P.O. Box 8800 (4B2L-1)**

5  **Corcoran, CA. 93212**

6  ================================================================

7  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA

**CW**

8  **Sherman Level Davis**
   (Enter the full name of plaintiff in this action.)

   CV 08      1978

9                    vs.                    )   Case No. _____
                                            )   (To be provided by the clerk of court)
10 **Derral G. Adams**                      )
                                            )   PETITION FOR A WRIT
11 _____         )   OF HABEAS CORPUS
                                            )
12 _____         )
                                            )
13 _____         )   E-filing
                                            )
14 (Enter the full name of respondent(s) or jailer in this action)  )

**(PR)**

15 ================================================================

16            Read Comments Carefully Before Filling In

17 When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland): **Alameda County Superior Court   Oakland California**

       Court                                  Location

(b)   Case number, if known **143004**

(c)   Date and terms of sentence **443 - Years to Life**

(d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)   Yes **✓**   No _____

Where?

Name of Institution: **CSP - Corcoran Prison P.O. Box 8800**

Address: **Corcoran, CA. 93212**

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

**14 - Counts total. (11 - Counts all second degree) (1 - Count attempted Robery)**

**(1 - Count 288, Oral Copulation) (1 - Count felon w/fire arm)**

3. Did you have any of the following?

Arraignment:                    Yes ✓        No _____

Preliminary Hearing:            Yes ✓        No _____

Motion to Suppress:             Yes _____    No ✓

4. How did you plead?

Guilty _____   Not Guilty ✓   Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury ✓      Judge alone _____   Judge alone on a transcript _____

6. Did you testify at your trial?              Yes _____    No ✓

7. Did you have an attorney at the following proceedings:

   (a)   Arraignment              Yes ✓        No _____

   (b)   Preliminary hearing      Yes ✓        No _____

   (c)   Time of plea             Yes ✓        No _____

   (d)   Trial                    Yes ✓        No _____

   (e)   Sentencing               Yes ✓        No _____

   (f)   Appeal                   Yes ✓        No _____

   (g)   Other post-conviction proceeding   Yes ✓    No _____

8. Did you appeal your conviction?             Yes ✓        No _____

   (a)   If you did, to what court(s) did you appeal?

      Court of Appeal              Yes ✓        No _____

      Year: 2005     Result: Denial _____

      Supreme Court of California   Yes _____    No _____

      Year: 2005     Result: Denial _____

      Any other court              Yes _____    No _____

      Year: _____   Result: _____

   (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS          - 3 -

1    petition?                          Yes _____    No ✓_____

2    (c)    Was there an opinion?       Yes ✓____    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                       Yes _____    No_✓_____

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _____    No_✓_____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding.  Attach extra paper if you need more space.

18    I.    Name of Court: _____

19    Type of Proceeding: _____

20    Grounds raised (Be brief but specific):

21    a._____

22    b._____

23    c._____

24    d._____

25    Result: _____Date of Result:_____

26    II.    Name of Court: _____

27    Type of Proceeding: _____

28    Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

III.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No_____

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    need more space. Answer the same questions for each claim.

2          [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: **See Attached, Page # 8**

6    _____

7    Supporting Facts:_____

8    _____

9    _____

10    _____

11    Claim Two: **See Attached, Page # 13**

12    _____

13    Supporting Facts:_____

14    _____

15    _____

16    _____

17    Claim Three: **See Attached, Page # 16**

18    _____

19    Supporting Facts:_____

20    _____

21    _____

22    _____

23          If any of these grounds was not previously presented to any other court, state briefly which

24    grounds were not presented and why:

25    **Grounds (1 thru 9) have not been exhausted in any Court. Please**

26    **See Exhibit-4 "Notice."**

27    _____

28    _____

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    <u>See, Table of Authorities</u>

5    _____

6    _____

7    Do you have an attorney for this petition?        Yes____     No _✔_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on <u>**April 3, 2008**</u>        <u>*Sherman Level Davis*</u>

14            Date               Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

# I

## PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS 6th AND 14th AMENDMENT U.S. CONSTITUTION AND ARTICLE-I, SECTION §14 AND §15 OF CALIFORNIA CONSTITUTION RIGHTS TO A FAIR TRIAL, LEGAL REPRESENTATION AND DUE PROCESS.

The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions. (Strickland vs. Washington, 466 U.S. 668 (1984).

## TRIAL COUNSEL FAILED TO INTERVIEW AND CALL WITNESSES.

A). On the night of petitioners arrest there was a civilian ride-along who was with the arresting officer. Her name was Marie Mason. She was inside of petitioners motel room with Officer Heussman when he went inside of a fannie-pack wrapped around petitioners waist and found a crack pipe and cocaine. At petitioners trial, officer Heussman testified that he found no drugs or contraband on the petitioner. He also stated that petitioner did not have a fannie-pack around his waist when he searched his person. But evidence at trial showed that petitioner did in fact have on a fannie-pack when police officers photographed him inside of his motel room. See, people's exhibits (9-53-61-62). There is also photographic evidence showing a crack cocaine pipe on the bed spread of

petitioners motel room. See, (Defense Exhibit-LLL). Once it becomes evident that officer Heussman has lied on the stand. It becomes very important to question his credibility. Especially in light of the fact that he found a gun behind the motel room that petitioner was checked into. The officer also is responsible for finding a tank top T-Shirt that was identified as one worn by a robbery suspect. Civilian ride-along Marie Mason was the only person who was with officer Heussman from the time of initial contact with the petitioner up until his arrest. She witness all that the officer did. She sat within two feet of the officer and watched him go into the petitioners fannie-pack and pull out drug contraband. She can prove that the officer lied on the stand. But more importantly she can give us an account of what really happened on the night of petitioners arrest.

The petitoner is contending that defense counsel's failure to call this witness was in violation of his "Compulsory Process" rights that was held applicable to the States through the Fourteenth Amendment in (Washington v. Texas, 388 U.S. 14, 19 (1967). The exculpatory value of this witness goes towards undermining the credibility of the arresting officer. As well as raising reasonable doubt on Count 14 of petitioners trial. Felon in possession of a firearm.


   B). Defense Counsel failed to call the previous owner of petitioners vehicle. Victim Jennifer Weidner was very adamant on the witness stand when she stated that the suspect drove a gold colored car. While being shown pictures of petitioners car by the defense, she stated that the car in the pictures could not have been the car the suspect drove. So the prosecution had the arresting officer say that though petitioners

1  car was silver in color, it had a tendency to look gold under certain
2  lighting conditions. The prosecution had other law enforcement
3  witnesses who had saw the car in person testify to the fact that
4  Witness Jennifer Weidner could have mistakenly thought that
5  petitioners car looked gold under certain lighting conditions.
6  Exhibit-(1) is a copy of a request by the jury to see the petitioners
7  car in person. The jury were not able to see petitioners car because
8  it had been somehow lost from the police impound. Issues conc-
9  erning petitioners car turned out to be major. As it was the subject
10 of an investigation for jury misconduct. With the petitioners car
11 missing from the police impound. The original owner of the car, along
12 with her family members. Was just what the jury needed in order to
13 move beyond the prosecutions theory of a car that changes colors.
14 The record shows that Defense Counsel early in the trial that the car
15 was no longer in the police impound.
16 The contention is that Defense Counsel once again abandons petition-
17 ers "Compulsory Process" rights under (Washington v. Texas). The jury
18 were dead-locked on counts 12 and 13 once they were told that they
19 could not see petitioner car in person. This witness was crucial to
20 the defense in light of the fact the jury only wanted to know the
21 true color of petitioners car.
22
23   c). Defense Counsel failed to call witness Eva Sheehan. She was
24 a lady who spoke face to face with the robbery suspect minutes
25 before he went on to rob the "Body Time" store petitioner was on
26 trial for. Victim Balvinder Kaur was one of the ladies robbed in the
27 store "Body Time". She had also saw the suspect in the bookstore prior
28 to him robbing the other store. Balvinder Kaur is the one who told

10

1 the police officers that she saw the suspect earlier in the book-
2 store talking to Eve Sheehan. An employee who showed the robber
3 some books. Balvinder Kaur said that the only thing the petitioner
4 had in common with the suspect is that they were both black
5 males. Eve Sheehan had more contact with the suspect than anyone
6 and could have testified that Balvinder Kaur was right in saying
7 that the only thing petitioner had in common with the suspect
8 was ethnicity and nothing else. The fact that Mrs. Sheehan had
9 so much contact with the suspect but never called to the line-up
10 or shown a video of the line-up was quite odd. Maybe she was
11 shown the line-up but didn't pick the petitioner.
12 The contention is that Defense Counsel abandoned the "Compulsory
13 Process" right of the petitioner by not interviewing this witness.
14
15    D). Defense Counsel failed to call crime-scene photographer as witness.
16 The crime-scene photographer was valuable because he saw petitioner
17 car in person and could testify to its true color. The photographer is
18 important to the issue of the white tank-top T-shirt that was suppos-
19 edly found in petitioners car but never photographed with all the other
20 clothing that was found in petitioners car. The victims in counts 12 and
21 13 said the suspect wore a white tank top T-shirt. The question is did
22 the police photographer ever see the T-shirt? There is so many questions
23 that need to answered concerning evidence that was photographed, but lost
24 before being brought to trial. Such as (Peoples-8,9,53,61,62); (Defense-LLL);
25 and (People exhibit-22), the white tank top that was brought into the trial
26 but never photographed.
27 The contention is that Defense Counsel abandoned petitioners "Compulsory
28 Process" rights by failing to call this witness.

11

"The United States Supreme Court clearly recognized the importance of the "Compulsory-Process" right. The right to offer testimony of witnesses, and to compell their attendance, if necessary, is in plain terms, the right to present a defence." (In re Martin, 1987, 44 Cal. 3d 1,744 P.2d 374,241, Cal. Rptr. 263.)Citing, (Washington V. Texas, 1967, 388 U.S.14 [18 L.Ed 2d 1019, 87 S.Ct. 1920.)

Under (Strickland V. Washington, at 2063); the "Compulsory Process" right is attached to the petitioners over all trial right of having evidence presented that is subjected to adversarial testing by an impartial tribunal. Defense Counsel's failure to call forth the aforementioned witnesses. It adversely affected petitioners oppertunity to undermine or raise doubt concerning the credibility and or reliability of the prosecutions witnesses and evidence.

# II

## PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER CALIFORNIA AND UNITED STATES CONTITUTION.

The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions. (Strickland V. Washington, 466 u.s. 668 (1984).

## TRIAL COUNSEL FAILED TO PRESENT EVIDENCE AT TRIAL.

A). Defense counsel failed investigate and present "Dental Records" belonging to the petitioner. Witness Karen Nelson said on the witness stand that the suspect was missing several teeth on the bottom row, and to the side of his mouth. The petitioner informed his attorney that upon his arrest he had no missing teeth. He informed his attorney that somehow someone has passed this information on to Karen Nelson. The petitioner then informed his attorney that "dental records" at the main County Jail, will show that he just recently had the teeth removed that the witness referred to. On the subject of the removal of petitioners teeth. He told his attorney that early September of 2001. "Western Dental" in Oakland California was unsuccessful in removing the two bottom row teeth because the petitioner had an immunity to novicaine. The dentist referred petitioner to an oral surgen. When the petitioner went to the

13

1  dentist department in the County Jail. He had the same problem of
2  not being able to respond to shots of novicaine. The petitioner was
3  told that he would be rescheduled pending the acquisition of his
4  dental records from "Western Dental". After the County Jail located
5  the dental records the petitioner had his lower, two side teeth removed
6  by the County Jail oral surgen.
7  What petitioner is contending is that defense counsel cannot
8  afford to disregard the dental records; because if you allow a witness
9  such as this to point out a distinguishing physical feature on a suspect
10 the jury will believe her. Witness Karen Nelson never mentioned the miss-
11 ing teeth in the police report, identification supplemental, or while giving
12 testimony at the "preliminary hearing". The exculpatory value of this
13 evidence is that it shows that petitioner could not have been the person
14 at the bank robbery because you have two sets of dental records by two
15 different agencies showing that the two teeth in question were naturally
16 attached to his jaw bone.
17 In (Strickland v. Washington, at [14], 2066); the court establishes that the
18 " defense counsel's actions are usually based, quite properly, on information
19 supplied by the defendant". In this case, the one time that counsel was
20 able to speak with the petitioner before trial, could not really be seen
21 as an attorney visit, because even that one time counsel told petitioner
22 that she could not discuss his case with him because she had not yet seen
23 and reviewed his file. Even though defense counsel failed to investigate
24 prior to trial. And even though she may have been laboring under a
25 conflict of interest by failing to ask the trial court for a continuence
26 so that she may prepare for trial. The Supreme Court, under (Strickland,
27 at [14], 2066; In essence declares that defense counsel should have acted
28 on the information concerning the dental records.

B). Defense Counsel failed to present trial evidence marked Defense Exhibit-(LLL). This evidence is a photograph of a crack cocaine pipe and white hard substance which appears to be rock cocaine. This photo is taken showing the above items on a bedspread in the motel room of the petitioner. Defense Counsel had this photo in a stack of other photos that had obviously been given to her by the prosecution. The probative value of evidence is that it establishes that officer Heussman lied on the trial stand when he told the jury that he had found no drugs or contraband on the petitioner that would justify arresting the petitioner when he first made contact with him in his motel room. By using this to impeach officer Heussman. It is likely to show the jury that if he lied about what he did not find; or said he did not find. Then he can also be telling a lie about what he said he did find. Mainly the gun he found in the back of the motel building, and the white tank top T-shirt he claimed to have found in petitioners car after he was arrested.

The contention here is that defense counsel abandoned the adversarial process by not offering evidence that would challenge the credibility of the arresting officer. The (Strickland v. Washington, at 2064); Court has established that "counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. see (Powell v. Alabama, 287 U.S. at 68-69, 53 S.ct.

C). Defense Counsel failed to present evidence by Ford Motor Company. The evidence was internet online information by the Ford Company stating that their 1992 Ford Probe car was released only in the factory colors of (black, white, and silver). And that there was no special metallic paint used that would make the car appear to change colors under certain lighting. This information was discovered by co-counsel trainee, Anne Winterman. But it was rejected by lead counsel Judith Browne.

## III

# PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER CALIFORNIA AND UNITED STATES CONSTITUTION

The Sixth Amendment guarantees the right to effective assistance of Counsel in Criminal prosecutions. (Strickland V. Washington, 1984)

## TRIAL COUNSEL FAILED TO IMPEACH. IN VIOLATION OF DEFENDANTS RIGHTS TO CONFRONTATION CLAUSE.

A). Defense Counsel failed to impeach officer Heussman's trial testimony that he never found anything on the petitioners person that would justify making an arrest of the petitioner upon his initial Contact with him. As noted earlier in this Complaint; there is both, photo evidence, and an eye-witness that can prove that officer Heussman did find Contraband and could have placed petitioner under arrest. See Sections; (I (A), and (II (B) of this report.

The petitioner is Contending that defense Counsel had no tactical reason for failing to impeach officer Heussman. In (Gargle v. Mullin, 317 F.3d 1196, 1211 (10th Cir. 2003), the Court held; failure to investigate Sources for impeachment," warranted presumption of prejudice."

B). Defense Counsel failed to impeach bank manager, Amelia Chelle w. While testifying at trial Mrs. Chellew stated that after She attended the police line-up at Albany Police Dept. She left the police dept. by her

1  self and never spoke with any of her co-workers from the time she left
2  the police dept., until the hour or two later when she called back to the
3  police dept. to inform the investigator that she had made a mistake on
4  who she picked as the suspect of the bank robbery. She changed her
5  choice from line-up #(1); to line-up (5); which was the petitioner. Prior
6  to Mrs. Chellew taking the stand. Her co-worker, Evelyn Herrera; testified
7  that after the police line-up, herself and Mrs. Chellew left the police
8  station together, and that while the two of them were in the car;
9  Mrs. Herrera told Mrs. Chellew that she picked the wrong person in the
10 police line-up. She told Mrs. Chellew that line-up #(5) was the person
11 who robbed the bank.
12 The petitioner is contending that the information to impeach Mrs. Chellew
13 was already on the trial record at the time of her testimony. The defense
14 counsel totally abandoned the petitioners rights of "Confrontation Clause".
15 In (Ky v. Stincer, 482 U.S. 730, 737 (1987), the court held; "the Confrontation -
16 Right is designed to promote the truth-finding function of trial".
17
18  c). Defense counsel failed to impeach witness Lesley Pulaski. On
19 the trial stand Mrs. Pulaski stated that she did not talk to the 911-
20 dispatcher when the robbery was being reported. See trial record, (2212).
21 The petitioner then tells defense attorney that the witness is not telling
22 the truth. The petitioner gives defense attorney a one page computer
23 printout of the 911 call showing that Mrs. Pulaski had in fact spoke at
24 great lenths on the phone with the 911-dispatcher. The petitioner mentions
25 this 911 document on the trial record. See (RT-2310). Defense counsel
26 suddenly remembers that she has a copy of the 911 recording on a
27 cassette tape. Marked in the trial as Defendant (Exhibit-XX). But because
28 defense counsel never conducted pre-trial investigation or preparation; she

1  is caught off guard by the fact that there is evidence that contradict
2  Mrs. Pulaski's testimony. The record shows that the petitioner disagreed
3  with how his defense attorney wanted proceed with introducing this
4  evidence to the jury. Defense attorney proceeded with letting Witness
5  Pulaski listen to the 911 recording without the jury being present.
6  The jury was brought back into the courtroom and listened to Witness
7  Pulaski explain that the whole thing was just a lapse of memory on her
8  part.
9  The contention is that the defense attorney did not know how to use
10 Witness Pulaski's prior 911 statements to impeach her trial testimony.
11 By letting Mrs. Pulaski to first listen to the 911 recording outside of
12 the presence of the jury to refresh her memory. And then allow her to
13 go back in front of the jury and offer testimony about her lapse in memory,
14 amounted to defense attorney conducting damage control on behalf
15 of the prosecution. Exhibit-(2) of this complaint is a transcribed copy
16 of Mrs. Pulaski's conversation with the 911 dispatcher. It appears that
17 she gets on the phone on page #4, line-16, and remains ▆ on the phone until
18 police arrive.
19 Each of these three witnesses have implicated the petitioner in a crime.
20 All three have evidence against them that prove they lied on the trial stand.
21 Defense counsel has shown a pattern of abandoning petitioners rights
22 of "Confrontation Clause", and "Adversarial Process." And these violations
23 have occurred under Federal and State law. See (Strickland v. Washington,
24 at, 2063). See (U.S. v. Cronic, 1984, 104 S.ct. 2039, at, 2047). See (People v. Ledesma,
25 43 cal. 3d 171, 729 P.2d 839; at 218[6] and 215 [4].) See (People v. Pope, 23 cal. 3d 412; at
26 (424). In (Kimmelman v. Morrison, 1984, 104 S.ct. 2039, at 2593); Justice Powell and
27 Rehnquist; concurred." right to effective assistance ensures right to contest charges,
28 and defendant has a valid claim when denied this opportunity, regardless."

## IV

# PETITIONER WAS DENIED
# EFFECTIVE ASSISTANCE OF COUNSEL
# UNDER CALIFORNIA AND UNITED
# STATES CONSTITUTION

The Sixth Amendment gaurantees the right to effective assistance of Counsel in Criminal prosecutions. (Strickland V. Washington, 1984).

## TRIAL COUNSEL FAILED TO SUPPRESS
## AND OBJECT TO EVIDENCE

A). Defense Counsel failed to object to white tank top T-shirt being admitted into evidence without ever laying a foundation of where the T-shirt Came from and who discovered it. The T-shirt was introduced into evidence by the prosecutor; as (Peoples Exhibit-22). The T-shirt Concerns Counts 12 and 13; where the Suspect was described wearing a dirty white tank top T-shirt.

The Contention here is that even after petitioner told defense attorney that the T-shirt was not his. Defense Counsel still failed to have the prosecution explain how the T-shirt is connected to the petitioner. Since there is nothing on the record or introduced to the jury Concerning where the T-shirt Came from; how Can the petitioner Contest this evidence in front of the jury. This is a piece of clothing that Connects the petitioner to several Crimes. A Connection that was made without any Kind of preliminary fact being established as to how you Can make or ask the jury to make an assumption that the T-shirt belonged to the

Petitioner. This evidence was brought in off the streets without it ever being photographed with all the other items discoverd on the night of petitioners arrest. Because defense counsel failed to object or seek suppression of the aforementioned evidence. The petitioner was not able to contest the evidence, or cross-examine the finder of evidence. This constitutes an abandonment of the adversarial process under (Strickland V. Washington, 1984, at 2063), "A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal." The "Strickland" court goes on to say: "Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial process", at 2064. The Court in (United States V. Cronic, 1984, 466 U.S. 648, 658-659 [104 S.Ct 2039, 2046-2047), states that whenever the prosecutions case has not been subjected to a meaningful adversarial test-ing process the result of the trial is unreliable."

   B). Defense counsel failed to seek an instruction on lesser evidence The prosecution introduced into evidence (Peoples Exhibit-8). It is a photograph of a black canvass tote-bag found in petitioners car at the time of his arrest. It was introduced by the prosecution because it looked similar bag that was described in counts 1 and 2 bank robbery. Prosection stated that she could not produce the actual bag because it was lost with the petitioners car. The prosecution further stated that when a photo of the black bag was taken by Inspector James Taranto of the D.A.'s office. See trial record, (RT-3320). No bank robbery charges were filed at the time the photo was taken. But Inspector Taranto testified that he took the pictures of the bag while petitioners car was still in police impound on 4-12-02. See trial record, (RT-2125). On 12-17-01 petitioner was formally charged in Oakland Municipal Court with the counts 1 and 2 bank robberies. So the prosecution lied when she said no bank robberies

1 had been filed on petitioner by 4-12-02. After the bank robbery charges
2 were filed against the petitioner, he had attended Court dates on those
3 charges between 12-17-01, and 4-12-02. They were: (1-18-02) (1-29-02)
4 (2-26-02), and (3-21-02). What this clearly shows is that petitioner had
5 been formally charged with the robberies at the time the prosecution
6 had the actual black bag in their possession. After they photographed the
7 bag it was somehow lost.

8 The contention is that defense Counsel failed to have the jury instructed
9 that since prosecution had actual evidence in their possession; but chose to
10 present "lesser evidence". The lesser evidence can be viewed with doubt.

11 c). Defense Counsel failed to object under applicable or seek Suppression
12 under applicable Law; Concerning a tainted photo of petitioners car which
13 has been clearly photographed under false lighting to give the appearance
14 of a gold tint. The record showed that defense counsel objected to the
15 showing of the photograph to the jury, by the prosecution. See trial
16 record, (RT-1806). But because defense counsel never Conducted any kind
17 of pretrial investigation. She was unsuccessful in Correcting the injustice
18 and protecting her client the petitioner. Counsel failed to research the law
19 Concerning this issue. In (People V. Slocum, 1975, 52 Cal. App 3d 867, 891-892,
20 125 Cal. Rptr. 422), the Court states; "The admissibility of a photograph or
21 motion picture is whether it fairly depicts the person, scene, item or event
22 it purports to portray." In (People V. Viaza, 1966, 244 Cal. App. 2d 121, 126-127,
23 52 Cal. Rptr. 733), the Court States; "When a photograph or film is an impor-
24 tant issue it must be shown that the photograph or film was taken
25 under conditions similar to those existing at the time of the event in
26 question." The vehicle in question was described in the conditions of daylight
27 outdoors, from two feet away. The presecutions photo was taken inside of
28 the police impound warehouse where it was dark inside.

## V

## THE PROSECUTION ENGAGED IN MISCONDUCT AFFECTING THE JURORS VERDICT IN VIOLATION OF PETITIONERS 5ᵗʰ AND 14ᵗʰ AMENDMENT RIGHTS OF THE U.S. CONSTITUTION DENYING PETITIONER THE RIGHT TO DUE PROCESS AND TO A FAIR TRIAL.

A). Prosecution took evidence out of the Courtroom, showed it to a witness in the hallway of the Courthouse, and then told the witness that she would be having her identify that very jacket while on the witness stand. While being cross-examined by defense counsel, witness Sophia Marzocchi testified that the prosecution showed her "Peoples (Exhibit-18)", a black leather jacket, and told her she would have her identify it again inside the Courtroom. See trial record, (RT-646).

The contention here is that because the physical evidence in this trial did not match petitioner. The circumstantial evidence would be the only way to get a conviction. But when the prosecution breaks the "Chain of Custody" by taking evidence out of the Courtroom. ■Perjuring the witness by deliberately contaminating her identification of the evidence. And then offering the contaminated identification to the judge and jury as though the witness was identifying the jacket in relation to what she remembered from the day of the robbery. This is bad because we don't know much of witness testimony was contaminated by the prosecution in relation to evidence identification. Also, in relation to Counts (3-4-5-6-7); no other victim identified petitioner in the police line-up. Mrs. Marzocchi was the only positive I.D. of petitioner out of five victims. So in this situation, there is good

1 reason for the assumption of prejudice because absent counsel's effort
2 to perjur this witness testimony, there is no other evidence that weighs
3 heavily against the petitioner. The Court has stated:

> "It is to much the habit of prosecuting
> officers to assume beforehand that a
> defendant is guilty, and then expect to have
> the established rules of evidence twisted, and
> all the features of a fair trial distorted, in
> order to secure a conviction. If a defendant
> cannot be fairly convicted at all; and to hold
> otherwise would be to provide ways and means
> for the conviction of the innocent." (People v. Podwy's,
> supra, 6 Cal. App. 2d, at pp. 72-73, 44 P.2d 377). Quoted
> by; (People v. Pitts, 273 Cal. Rptr. 757, at 870, 223 Cal. App.
> 3d 606 (Cal. App. 5th Dist. 1990).

16 Petitioner contends that the prosecution both, twisted rules of the
17 evidence by removing it from the courtroom to display in courthouse
18 hallway, and distorted the trial by offering contaminated identifica-
19 tion testimony to the judge and jury.

20 B). During closing arguement the prosecution inflamed the jury by
21 referring to the petitioner as acting like a "terrorist." See trial record,
22 (RT-3374, 3377). But what was even worst was the video projector she
23 used and had the word "Terrorist" in big bold letters on the screen.
24 The first contention is that the prosecution's characterization of the
25 petitioner acting like a terrorist assumes facts not in evidence. Secondly
26 the suspect in these robberies not only robbed the store, but he also robbed
27 the customers as well. The prosecution uses two examples of the suspe-
28 cts actions during the robbery to justify addressing petitioner as a terrorist.

1  The prosecution says that the suspect always entered the establish-
2  ments acting nice and polite, and then turned terrorist. She said the
3  suspect always puts his victims in the back of the establishment. As
4  to these two methods of operation used by the suspect. The petitioner
5  contends that for a robber to pretend to be a customer, or to gather
6  everyone together before ordering them to empty their purses. Though
7  it may be enough to establish as a signature (M.O.) if a robber does
8  things the same way. This does not warrant calling the petitioner
9  a terrorist in nature. In the post (911) terrorist error. Any references
10 to someone as being associated with, or acting like a terrorist strikes
11 an immense amount of fear into people. Especially if that person is
12 an authority figure on the side of justice. This characterization of
13 the suspect/petitioner as possessing terrorist behavior was totally out
14 of context in relation to the charges. No jury will vote "not guilty" for
15 a defendant who has the word "Terrorist" right next to his name
16 during final arguement. Especially if there is no objection by the judge
17 or the defense counsel. The court states:

18  "The prosecution should reframe from arguement which
19  would divert the jury from its duty to decide the case
20  on the evidence by injecting issues broader than the
21  guilt or innocence of the accused under the controlling
22  law." (United States V. Young, 470 U.S. 1, 105 S.ct. 1038, at 1042,
23  (1985)

24  Also;

25  The average jury, in a greater or less degree, has confidence
26  that these obligations, which so planely rest upon the pros-
27  ecuting attorney will be faithfully observed. But improper
28  suggestions, insinuations, and especially, the assertions

24

of personal knowledge are apt to carry much weight against the accused when they should properly carry none." (Berger v. United States, 295 U.S. 78, 55 S.ct. 629, at 633).

By referring to the petitioner as behaving like a terrorist with her words and simultaneously with a wall projector. By doing this the prosecution introduced into the trial an issue that was monumentally broader than what the petitioner was charged with. And because the average jury person has faith in the prosecution as an officer of the court and advocate for the people. Prejudice from the result of prosecutions actions must be presumed to have had an irreversible effect on the jury and outcome. The Court has ruled in the following cases:

"Conviction reversed because prosecutors statements inflamed the jury, threatened defendants right to a fair trial, and were not mitigated by curative instructions." (US v. Weatherspoon, 410 F.3d 1142, 1152 (9th cir. 2005)

Also;

"Prosecutions comparison to the defendant with Adolf Hitler was improper." (Allen v. Woodford, 395 F.3d 979, 1016 (9th Cir. 2005)

Also;

"Prosecutor's description of defendant as a liar was improper because it constituted personal opinion regarding defendants credibility." (US v. Garcia Guizar, 160, F.3d 511, 520 (9th cir. 1998)

c). Prosecution lost or destroyed petitioners vehicle, preventing petitioner from proving his innocence on Counts (12-13). Witness Jennifer Wiedner was a victim in Counts (12-13), in which she was sexually assaulted during a robbery of her boyfriends work-place. She was the only one out of the two victims who were able to remember specific details about the description of the suspects vehicle and marks on his body. At trial Mrs. Wiedner testified that the car that the suspect drove was gold in color and that it was a 1991 Ford Probe because in High School her boyfriend had the exact car. See trial record, (RT-1757). Mrs. Wiedner stated that she was absolutely sure that suspects car was not silver in color. See (1828) of trial record. The witness was showed photos of petitioners car taken on the night of his arrest by crimescene investigaters. They were marked, (Defense Exhibits-QQ, and RR.) The witness said that the car in these photos could not have been the car at the scene of the crime. See trial record, (RT-1829, 1830). This was the first time on the record that it was mentioned that the car was no longer in the police impound. See trial record, (RT-1807). At this time there was no objection by the defense counsel under the "Brady" rule. (Exhibit-1) of this complaint is a request by the jury to see the actual car in person. The second page of (Exhibit-1) of this complaint is another request by the jury indicating that they cannot reach a unanimous decision on Counts (12-13). These are the counts concerning the car. The exhibits show that on 8-6-03, at 10:25 AM, the jury asked to see the car in person. And a few hours later at 1:50 PM, the jury announced that they could not reach a unanimous decision on Counts (12-13). This shows us two things. One of which, it was a close case on Counts (12-13). And the color of the car is where they knew they

1  Could resolve the greatest issue concerning counts (12-13). What the
2  prosecution did was have someone go to the police impound and photo-
3  graph the car under some kind of yellow lamp to make it appear that
4  it had a gold or yellow glare. The (Peoples Exhibits~35,36) are those dist-
5  orted pictures. The photos of the car have a yellow glare on the top
6  of the car while the sides are much lighter. The whole warehouse
7  was completely dark and the picture is meant to assume that the
8  car had its own natural illumination. The prosecution had an
9  officer and an ██ investigater who testified that the car
10 has a tendency to look gold under certain lighting conditions.
11 Based on the facts mentioned so far concerning the car, there is a
12 sufficient amount of evidence that support the claim that prosecution
13 knew the exculpatory value of the car before it was lost from inside
14 the police impound. How does a vehicle get lost out of the police impound
15 along with other evidence that was left inside the car, like the black
16 bag in (Peoples Exhibit-8)? Looking at the trial evidence; (Peoples Exh-
17 ibits~24,25,49,50), we can learn how important a role the car played in this
18 whole case. They are the (arrest reports, Daily Police Bulletin, Police Dept. special
19 Bulletin, and Communications order). We learn that prior to petitioners arrest
20 there was "Bulletin" out for a 1991 Gold Ford Probe. A victim of a crime gave
21 the police a full description of the suspects vehicle. The arresting officer
22 saw a vehicle meeting the description of the "Daily Police Bulletin." The
23 officer went into the motel where the vehicle was parked and made
24 contact with the vehicle's owner. The arresting officer Heussman
25 testified on the stand in support of prosecutions theory that the
26 vehicle looks gold under certain lighting conditions. But on the same
27 night of the arrest while the suspect was driving away, Heussman
28 radio's all available units that suspect is fleeing in Silver 1991 Ford Probe.

27

1  The petitioner was arrested the day after Counts (12-13) occured.
2  The petitioner did not have the scars on his arm that the victim had
3  Seen on the Suspect. And the scars that the petitioner did have on his
4  arm the witness did not notice. Photos were taken of petitioners
5  arm prior to his arrest. Witness Wiedner never positively identified
6  petitioner in the line-up which was two days after the Crime. The
7  petitioner was not wearing the same Watch as the Suspect wore the
8  day before. The witness said the Suspect was Clean Shaven. But the
9  pictures taken of petitioner by police 24-hours later show petitioner
10 with a short afro, Mustache, and beard. The photos taken of petitioner
11 are listed; (Peoples Exhibits~9, 53,58,61,62). The Courts have stated:

12     "Exculpatory evidence is evidence the Suppression of which
13      Would undermine Confidence in the outcome". (U.S. V Ruiz,
14      536 U.S. 622, 628 (2002) (quoting Kyles, 514 U.S. and at 435).

16 Not only did jury asked to see the Car in person. Trial record also show
17 that the jury requested to see all of the photos of the car presented in
18 trial. Those exhibits were: (Peoples Exhibits~35,36,57,65), and (Defense
19 Exhibits~QQ, RR). See trial record, (RT-3559).
20 The Court has also stated:

21     "Due Process is Violated if: (1) defense requests Suppressed
22      material; (2) Prosecution Suppresses evidence favorable to
23      the defense ▮ upon request"; (3) evidence is material to guilt
24      or punishment.) Brady V. Maryland, 373 U.S. 83, 87 (1963)

25 The petitioner Contends that the Vehicle was the difference betwe-
26 en innocence and guilt in this Case. The prosecution introduced Color
27 Changing theory. But they made it impossible for the defense or jury to
28 test their theory against the actual evidence. Causing irreversable prejudice.

D). The prosecution interfered with the investigation of the jury concerning the charge of "jury misconduct". After the verdict in petitioners trial, the defense counsel, while talking with several members of the jury. Heard jury members speak about how they, out looking at cars on the streets were able to determine if they could change colors. After hearing jury members talk about their observations and investigations that were taking place outside of the courthouse, using as evidence things that were not part of the trial. The defense conceded that "jury misconduct" had occurred.

On 8-26-03 the court acknowledged receipt of defense counsel's motion for jury information, and informed the prosecution that she would have an oppertunity responding to this. See (RT-3639,3640).

On 9-4-03 the court acknowledged receiving the responce filed by the prosecution. Because the response by the prosecution was very lengthy, the court and the defense needed time to read it. See (RT-3643)

On 10-31-03 the court acknowledged a contention by the defense that while investigator Paul Perez of the Public Defenders Office made contact with six jury members who informed Mr. Perez that they had been contacted by the prosecution and told by the prose- cution that if the public defender contacts them, they are to call the District Attorney for further instructions. See (RT-3648)

On 11-14-03 the court heard the impact that the prosecution's letter had on the jury members that Mr. Perez was able to contact.

Juror #8 was angry with investigator Perez and stated that he had received a letter from the District Attorney, and would rather speak to the District attorney. See (RT-3670,3672).

Juror #1 stated that he had been talk with the District Attorney concerning some statements he made that may have been misconstrued.

29

1  See, (RT-3674).

2  Juror #11, Mr. Perez believed also told him that they had also recei-

3  ved a letter from District Attorney. See, (RT-3677).

4  Jurors # 9 and 12 told Mr. Perez that they had not received letter.

5  Juror #6 told Mr. Perez that they were not going to tell him if they

6  got a letter from District Attorney or not. The juror got angry with

7  him and threatened to call the District Attorney on him. See,

8  (RT-3678).

9    Out of the six people that Investigator Perez contacted,

10  only four had at that time received letters from District Attorney,

11  and they all refused to talk with Mr. Perez.

12    The record indicates that the trial judge agreed that the

13  "statute" gives the defense the right to make an independent

14  effort to contact the jurors. See, (RT-3660).

15    The contention is that the prosecution interfered with an

16  investigation into jury misconduct that had been cleared by

17  the trial court, and legal under the U.S., and California Cons-

18  titution. The prosecution "mis-represented" the law when

19  she told those jurors to not talk with the Defense until

20  after they first contacted the District Attorney. Under the

21  "California Code of Civil Procedures" 237(b), 237(d), or 206(g). None

22  of these that the court cited on the record gives the prosecution,

23  prosecuting a case the right to instruct the jury not to talk with

24  defense attorney's investigating jury misconduct. This is the work

25  of a prosecutor who has established a pattern of disregard for

26  the "rules of the court", as well as "judicial procedure." The court filed

27  a copy of the letter that the prosecution sent to the jurors.

28  See, (RT-3648).

The Court in (Greer v. Miller, 483 U.S. 756, 97 L.Ed 2d 618, 107 S.Ct. 3102, at 3109) "that prosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process". Quoting (Donnelly v. De Christoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed 2d 431 (1974). When you look at all four claims of misconduct and the impact they each had on the trial. One might wonder how it is that they were never challenged an objected to. It is because the level of ineffective assistance of counsel matched the gross level of the prosecutorial misconduct. While discussing his dissenting opinion in Strickland v. Washington, Justice Marshall spoke about how an ineffective defense counsel can make injuries to the client seem as though they never happened:

> "It is often very difficult to tell whether a defendant convicted after a trial in which he was ineffectively represented would have fared better if his lawyer would have been competent. Evidence of injury to a defendant may be missing from the record precisely because of the incompetence of defense counsel". (Strickland, at 2076)

I believe that the jury came into the trial with the desire and intention to render its findings after witnessing a fair adversarial process. But when they witness the effects of a prosecutor showing evidence to witnesses outside of the courtroom. Evidence that they should be viewing missing. Listening to the prosecutior argue that they will be deliberating on ▬ Man with terrorist behavior and tendencies. The jury in this case became prejudice as the result of a prosecutor who was out of control, a judge who did nothing to keep prosecutorial misconduct to a minimum; and a defense attorney who just came in at the last moment to push this trial through the motions.

## VI

## JURORS COMMITTED MISCONDUCT BY CONDUCTING THEIR OWN INVESTIGATIONS OUTSIDE OF THE COURT AND FOR BRINGING INTO THE TRIAL EVIDENCE NOT PRESENTED BY THE COURT, RESULTING IN AN UNFAIR TRIAL FOR DEFENDANT.

A). Jury foreperson David Le Claire brought into the deliberations outside information to influence the other jurors. While being interviewed by Investigator Paul Perez. Juror #4, Stacy Ramirez said that during their deliberations foreperson Le Claire told the jury that he saw a parked car at a Bart parking lot which was either gold or silver in color and spent some time looking at it. He went on to tell the jury that based on that observation he was convinced that gold and silver looked similar under certain lighting conditions. He went on to tell the rest of the jury that this observation made him feel warm and fuzzy inside about his decision. See (Exhibit-3). The contention here is that Mr. Le Claire used outside information to argue his siding with the prosecution in that the petitioners silver car could have looked gold to the victim. Being that Le Claire was acting as the jury foreperson we can assume that the impact of his judgement was respected by the other jurors.

B). Juror James Curtis brought into the trial information that he solicited from outside sources. Mr. Curtis told the jury that while he was at a paint shop on personal business,

he inquired about does the colors gold and silver sometimes get a little mistaken for each other. Juror Ramirez stated that she did not at this moment remember word for word what answer James Curtis said he got from the employee at the paint store, but the opinion he shared with the jury was unfavorable to the defendant. See, (Exhibit-3).

The contention here is that Juror James Curtis went against the judge's "Instructions" in two accounts:

    1). He conducted an independent experiment or investigation for the purposes of descovering a fact. And he brought his findings back and shared them with the jury.

    2). He also broke the instruction about not conversing with anyone on any subject connected with the trial. see (RT-90).

The Court has stated: "Any verdict issued as a result of extraneous influences prejudice the defendant and once demonstrated the defendant is entitled to a new trial". (Remmer V. United States, 347 U.S. 227, 229, (1954)

The lower courts have stated:

    "A new trial is required if there is a substantial likelihood of the vote of one or more jurors was influenced by exposure to prejudicial matters outside the trial record." (In re Carpenter, 1995, 9 Cal. 4th 634, 38 Cal. Rptr. 2d 665, 889 P.2d 985). Also; (People V. Holloway, 1990, 50 Cal. 3d 1098, 1108-1110, 269 Cal. 530, 790 P.2d 1327).

And to touch more specifically on the acts of outside investigations the Courts have stated:

> "It is misconduct for jurors to conduct investigations independent of the trial evidence." (People v. Conkling 1986, 111 Cal. 616, 828). (People v. Castro 1986, 184 Cal. App. 3d 849, 853).

C). Juror Sharon Layden brought into the jury deliberations her past knowledge of sexual assault victims, and offered it as "Expert Testimony." Juror Ramirez stated that, Juror Sharon Layden told the jury that she either had a friend or knew someone who worked in a clinic that dealt with sexual assaults and that she had some knowledge in that area. See, (Exhibit-3). The first contention is that the juror is claiming to possess a knowledge about sexual assault; but never mentions this when asked how she feels about sitting on a jury in a case involving a sexual assault. If during the jury deliberations she qualifies her self as one who has knowledge and or experience concerning sexual assaults. She just didn't forget she had this knowledge during the "Voir dire" process. She knew she had this knowledge all along. And she was so confident in her knowledge of sexual assaults that she asked the jury to trust her judgement on the issue.

The petitioner further contends that even absent an evidentuary hearing. It is not hard to conclude that the information she gave to the jury regarding sexual assaults prejudiced the defendant. Like allowing the jury to hear victim impact testimony before they are sent off to deliberate.

34

The High Court has stated:

> "To establish reversible error in cases involving
> inadvertent nondisclosure, a ▮▮▮▮ defendant must demonstrate
> that a correct response would have created a valid
> basis for a challenge of cause." (McDonough Power
> Equip. V. Greenwood, 464 U.S. 548, 555, 556, (1984)

The fact that juror Sharon Layden appealed to the jury that she
possessed knowledge about sexual assaults, and that her knowledge
is not just personal opinion. Her knowledge is based on information
originates from a clinic that deals with the actual sexual assault.
How extensive and reliable her knowledge is does not give her the
right to present it to the jury during deliberations. There is a con-
flict of interest because knowledge about the effects that sexual
assaults have on the victim is not common every day information.
She is biased because she has an indirect connection to the victim.
By asking the jury to accept that she has knowledge concerning
sexual assault victims, she is in fact asking the jury to accept
the fact that she has a special connection to the victim or the
crime that they are deciding upon. Juror Ramirez did not indicate
that the jury rejected any of Juror Layden's information about
sexual assault victims, so we can assume that it was accepted into
the deliberation process.

The lower courts have stated:

> "Any showing of actual juror bias requires a
> new trial and the court need not determine the
> effect of such bias on the verdict because, under
> such circumstances, the error cannot be harmless." See,

(Dyer V. Calderon, 151 F.3d 970, 973 n.2 (9th Cir. 1998)

See Also;

"New trial required because juror admitted during deliberations to 7 years of experience with explosives and did not speak up during Voir dire." (US v. St. Clair, 855 F.2d 518, 522-23 (8th Cir. 1988).

See Also;

"New trial required because juror deliberately failed to disclose abusive family situation. In a case where woman killed husband claiming to protect herself and kids from abuse." (Burton V. Johnson, 948 F.2d 1150, 1158-59 (10th Cir. 1991)

Juror Sharon Layden abandoned the jury instruction when she entered into the jury deliberations and asked her fellow jurors to accept her knowledge of sexual assault victims as evidence. See jury instructions:

"You must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public safety." See (RT-89)

36

## VII

## DEFENSE COUNSEL FAILED TO INVESTIGATE JURY MISCONDUCT, AND DENIED PETITIONER HIS RIGHT TO TRIAL OF IMPARTIAL JUROR'S.

In the previous section on jury misconduct much of the nature of the misconduct has already been covered. The petitioner wishes to narrate key points instead of covering the whole five month ordeal.

Defense Counsel files a motion for jury information in regards to interviewing jurors for misconduct. The reason for this motion for jury information is because the defense counsel shredded all the jury information after the jury had been empanelled. Defense Counsel went on to say that she did not write down full names of of jurors. Only last names, cities, and age. See, (RT-3682, 3683). This information did not come before the court until 11-14-03. Basically, every since 8-7-03 the defense had kept quiet about only having the last names to track the jurors down, because they did not want to admit to destroying all the jury information. The prosecution expressed discompfort in the fact that defense counsel destroyed information and to so long to come clean about it. See (RT-3722). After two months of looking for the jurors, the court concluded that the defense has not kept up with the "Statute" as far as making an independent effort to locate the jurors. See, (RT-3660) The court agreed to give the defense more time to try and locate the jurors. See, (3662-63).

37

1  The case returned back to court two weeks later. After
2  having Investigator Paul Perez take the stand and testify
3  concerning his attempt to locate the jurors. The court came
4  to the conclusion that Mr. Perez's attempts to locate the jury
5  was a disaster. See, (RT-3663) through (RT-3737). The judge
6  made it clear that he wanted to make sure that petitioner, due to
7  the grave nature of his punishment, is given every chance to locate
8  juror's. See, (3720), (3724). Moments later the court gave what
9  would be its last concern about defense counsel's obligation
10 to ensuring her client receive a fair trial.

11 <u>The Court</u>: Take the last phrase: "finding as many
12        people as we could." Are you satisfied, in
13        ████ representing Mr. Davis, that your
14        office has provided the best efforts
15        that it can? You didn't come back and
16        ask me for their first names. see, (RT-3726)
17

18 The court then told defense to contact whoever they could,
19 and that then the court would decide if it would then send
20 letters to the other jurors. See, (3732). The defense then came
21 out of nowhere inquiring about setting a sentencing date. But
22 the court responded that if defense motion is granted there
23 may be no need for worrying about a sentencing date. See (3733,34)
24 At this point what we have is a trial judge that is clearly a bit
25 worried about a defendant who is not getting the constitutio-
26 nal legal assistance that is due him. And on the other hand we
27 have a defense counsel who wants this trial to end as soon as
28 possible. What happens next confirms these conclusions.

1  What happens now is defense counsel gets tired of pretending
2  to represent petitioner and starts hinting to the court that it
3  is time to get the petitioner sentenced.
4  <u>Defense Counsel</u>:

5       "And whether I do or don't get the papers in
6       by the 8th, the sentencing could go forward in
7       the afternoon of -- Well, I guess in the after-
8       noon of prior to the 19th? See, (RT-3735).
9  <u>The Court</u>:

10      "We will figure out a date." See, (RT-3735)
11 <u>Defense Counsel</u>:

12      "We could do that now, though, so she could
13      give them the date except for, you know,
14      and be able to tell them she could call it
15      off by the 8th, if I didn't file any papers."
16      See, (RT-3735).
17

18    The court and the defense are on two different pages. The judge
19 has told the defense counsel that neither her nor the investiga-
20 tor paul perez has satisfied the "statute" concerning investigating
21 the jurors concerning juror misconduct. The judge wants defense
22 counsel to locate who they can of the jurors, and he will help with
23 the rest. So this next court date is to see if the defense can make
24 enough of a claim to satisfy the "civil code of procedures statute",
25 so that he can call the jurors back and get their testimony.
26 But the defense counsel is practically begging the court to set
27 a sentencing date for her client. She is telling the prosecution
28 to get the victims ready to give impact testimony.

When she says; "in the afternoon prior to the 19th." She's talking about the very next court date. But she doesn't want her client to pick up on how blatant she is being about not giving her client the rights that the court has been trying to get her to perform.

When she says; "She could give them the date except for, you know." She's under the radar again trying to have the judge arrange for the prosecution to have the victims on stand by.

This defense Counsel destroys the jury information in the very beginning of the trial. She sends her investigator out with only last names to locate jurors. Once the judge admonishes the investigator and defense counsel for not doing their jobs. The court asks them to start again, but with the help of the Court. Defense Counsel basically says, "I don't have to investigate if I don't choose to. Unfortunately for the defendant; this is just the post-trial disaster. The actual trial performance of the defence counsel was much worse, and the prejudice was much more severe.

# VIII

## DEFENSE COUNSEL FAILED TO CONDUCT PRETRIAL INVESTIGATION AND PREPARATION, ALSO LABORING UNDER CONFLICT OF INTEREST RESULTING IN DENIAL OF PETITIONERS RIGHT TO A FAIR TRIAL.

On March 18, 2003. Petitioner received a June 2, 2003 trial date. In between the trial date the petitioner then receives a visit from defense counsel Judith Browne from the Public Defenders Office. The visit was in April, 2003. During the visit, attorney Browne stated that she could not discuss my case with me because she had not yet reviewed my file. The petitioner never heard from Mrs. Browne until the first day of trial.

A). Defense counsel did not have line-up cards for the two bank robberies that were never filed against petitioner. Nor did defense counsel ever know that petitioner was in line-up for two bank robberies but was not picked or identified by any of the banks employee's who attended the line-up. It was in the middle of trial while petitioner was going through evidence that he had received from his attorney who had been assigned to his case for the past year. Public Defender Maxine Fassulis. Petitioner handed attorney Browne the copies of the line-up and asked her if she could use them in her arguement.

1. Defense Counsel filed a motion to get access to the names and add-
2. resses of the bank employees. The motion was denied. See (RT-2235-55).
3. The contention is that this situation is the beginning of a trail
4. of information that establishes that defense counsel new very little
5. about the case that she was representing. Had defense counsel conducted
6. a pretrial investigation. She could have contacted the bank employees
7. herself and interviewed them as witnesses concerning the integrity of
8. the police line-up. And for the purpose of using them to raise doubt
9. Concerning counts 1 and 2 in petitioner case. If the petitioner looked
10. similar to the other person who robbed the other ▮ two banks then maybe
11. that person robbed the bank that petitioner is charged with.

12.     B). The defense counsel did not have the 911-printout for the
13. Ovation Clothing robbery. And she did not listen to the cassette
14. recording of the 911 phone call prior to trial. Witness Leslie Pulaski
15. testified that she never spoke on the phone to the 911 operator.
16. See, (RT-2212). Petitioner had a printout provided to him by his
17. former counsel that attorney Browne did not have. Petitioner then
18. produced the printout which led to defense attorney Browne bring-
19. ing into evidence Defendant (Exhibit-XX). Which is the 911 tape. Once
20. the petitioner showed attorney Browne the 911 printout that showed
21. Leslie Pulaski had in fact spoke on the phone to the 911 operator.
22. Attorney Browne could not impeach Mrs. Pulaski because she was
23. not prepared. (Exhibit-2) shows that Mrs. Pulaski did most of the
24. talking on the phone.
25. The contention is that the defense counsel had evidence that she
26. failed to review prior to trial. Her client, the petitioner, had to tell
27. her that the evidence was contrary to the witnesses testimony.
28. Petitioner went on the record submitting the printout. See, (2310).

C). The Defense Counsel did not have investigators report from a video line-up that Witness Sophie Devries attended. It was not until the Witness was on the stand that the petitioner informed his attorney that he had a report with statements by the Witness. The report was entered into evidence at that very moment as Defendant (Exhibit-DD). See, (RT-1128). Once again, the defense Counsel has a witness on the stand and does not know what prior statements that witness has made. The report stated that after Witness DeVries selected petitioner in the line-up, she asked the investigator did she pick the right person. As the defense, you definately want to follow up on the fact that a witness had doubts after identifying the petitioner. You can argue that the witnesses doubt was "reasonable doubt." The record shows that the defense did nothing to raise the doubt issue. See, (RT-1124). But on re-direct, the prosecutor took the steam out of Mrs. Devries statements by being the one to introduce them to the jury as subtle remarks. See, (RT-1127-28).

D). The defense counsel did not know that the petitioners car had been lost from the police impound. Had the defense counsel conducted an investigation prior to trial. There was good cause for sanctions against the prosecution for destroying the most important evidence concerning counts (12 and 13).

E). Defense Counsel failed to file a pretrial motion to severe charges. During the instructions discussion the trial judge told the defense counsel that by failing to file a pretrial severence motion, the defense may have waved her right to object now that the jury has heard all the evidence. See, (RT-3219). Defense counsel suggested that she could correct her mistake by giving

43

1  an instruction to the jury telling them not to lessen the bur-
2  den of looking at the evidence in each count; Simply because four
3  occurrences are charged. See, (RT-3220). The petitioner was charged
4  with 14 counts consisting of four robbery locations: A Clothing
5  store. A perfume store. A bank robbery. A deli robbery with a
6  forced oral copulation.
7  The main contention is a failure to protect petitioner from a
8  jury inflamed and influenced by the Sexual assault. The record did
9  reflect that it was ineffective assistance of Counsel. See (RT-3219)
10  F). Defense Counsel's failure to investigate prior to trial affected
11  ability of Counsel to be familiar with which victims belonged
12  to what crimescenes. During Counsels final arguement she
13  jumped from one crimescene to the next, without even knowing
14  it. She got so entangled in her mistakes that the jury found the
15  whole thing hard to bare. Jury members started making all
16  kinds of movements and jestures to let her know that she
17  was lost. One of the jury members spoke up and was then
18  admonished by the judge not to give input. It was clear to the
19  jury members that the defense counsel was not prepared to try this
20  case. And therefore her arguement lacked the credibility of a skilled
21  professional and adversary. At one point in her closing arguements
22  the defense told the jury: "You guys stop me". See, (RT-3505).
23  The contention is that the jury cannot trust an attorney who
24  does not care enough about their client, or their duties, to prepare
25  and learn the facts about her case. You cannot ask the jury to stop
26  you when you make a mistake, and still expect that same jury to
27  accept the rationale of your arguement. When an attorney stop being
28  a reliable advocate, they stop being an attorney.

G). Defense Counsel labored under a Conflict of interest. While the petitioner contends that much of defense counsel's failures were do to her own negligence. The petitioner also believes the ■ defense counsel knowingly tried this case under the conflict of the Public Defenders office substitution of counsel right before trial; and the Court wanting to move this case forward simply because they had an available courtroom. These two points argued by the petitioner on the record. June 2, 2003 Dept.11, p#6,7.

The contention is that defense Counsel had no reasonable chance of giving petitioner the assistance required under the U.S. and the California Constitution. Defense counsel's failure to investigate and prepare was but one of the effects the conflict of interest had on the overall unfairness of the trial. Because counsel had not been able to see or review petitioners file prior to that one visit they had before trial. Defense counsel felt there was no need to talk about the case until she reviewed his case file. So that one attorney and client visit was all introduction and non-legal. Petitioner said that attorney asked him no legal questions. see, (6-2-03, Dept.11, p.6). This case involved (32-Witnesses), (3 different law enforcement agencies), (14 counts-13 victims), (5-crime scenes), (155-pieces of evidence entered) How is it possible to appear on the very first day of trial, never having appeared on behalf of the petitioner, and never having had one pre-trial discussion with the petitioner about the case or the facts. Defense Counsel's failure to seek a "continuance" for time to investigate, and to prepare. Constitutes a knowingly participation in a Conflict of Interest. If we go back to a question the court put forth to defense counsel. "Are you satisfied, in representing Mr. Davis, that your office has provided the best efforts that it can"? See, (RT-3726)

45

These words by the Court reflects the sentiment of the whole trial. The petitioner did not receive the efforts that are consistent with a diligent and competent trial attorney. The Courts have stated:

> "A defense attorney is in the best position to determine when a conflict exists, and that he or she has an ethical obligation to advise the Court of any problems." (Mickens V. Taylor, 535 U.S. 162, 122 S. Ct. 1237, at 1240) Quoting; (Holloway v. Arkansas, 435 U.S. 475)

Also;

> "The right to assistance of counsel is not for its own sake; but because of the effect it has on the ability of the accused to receive a fair trial." (Mickens V. Taylor) Quoting (United States V. Cronic, 466 U.S. 648, at 658) It follows from this that the assistance which ineffective in preserving fairness does not meet the constitutional mandate, see (Strickland V. Washington, 466 U.S. 668, at 685-686).

The petitioner contends that this trial contained to many facts and questions of law to go into it without a pretrial investigation. The trial was a disaster from beginning to end. Even though the poor performance of defense counsel is evident everywhere. And there is no reasons for a lot of the things she did, and did not do. The effect of her laboring under a conflict of interest can still be seen by the fact that there was so much about this case that she did not know.

# IX

## CUMULATIVE EFFECT OF ERRORS DEPRIVED PETITIONER OF HIS 5th, 6th, AND 14th AMENDMENT RIGHTS

"Our decision to grant relief on ineffective assistance ground is a function of the prejudice flowing from all of counsel's deficient performance -- as Strickland directs it to be." See (Strickland 466 U.S., at 694, 696.) Quoted by; (Gargle v. Mullin, 317 F.3d 1196, at 1212). The Cumulative Errors Are As Follows:

1). The fact that this case consisted of; (14-Counts), (13-Victims), (5-Crimescenes), (32-Witnesses), (3-different law enforcement agencies), (155-pieces of evidence entered into trial). No jury Would find it reasonable for a defense counsel to face the above Conditions, When appearing on the first day of trial, and never having discussed the case or the facts with the petitioner.

The Strickland Court ruled that much of counsel's decisions throughout the whole trial is based on Conversations and information that is obtained from the defendant. see, (Strickland at 104, S.ct 2066).

2). Defense Counsel was never able to overcome her failure to prepare and investigate. Because at the end of the trial during Counsel's final arguement she still had trouble remembering the facts and details of the case. At one point she told the jury to stop her whenever she makes an error. See, (VIII-(F)). It was unprofessional and judicially unethical for a defense counsel to ask a jury to help her do Something that she has trained to do under the State Bar Assoc.

47

3). The defense Counsel violated petitioners rights to observe the "Confrontation Clause" on multiple grounds and issues. See, (II-(A)(B)(C)), and (III-(A)(B)(C)).

4). The defense Counsel violated petitioners rights to observe the "Compulsory Process Clause" on multiple grounds and issues. See, (I-(A)(B)(C)(D)).

5). The "Adversarial Process" is the main premise behind the trial proceedings. And if that process is One-sided. The result of proceeding cannot be counted fair or truthful when we have heard only one side of the story. A trial where there is the "People" and no "Defendant" is no trial at all.

In this Case defense Counsel failed to act prior to trial by not investigating or Seeking a Continuance. Defense Counsel failed to act during trial on a wide multitude of issues and failed to remember in her Closing arguements, the facts about the Case that had been already thoroughly discussed throughout the trial. Defense Counsel failed to act when the Court admonished her over five times during the post-Verdict investigation, during the jury misconduct issues.

6). The petitioner Suffered a number of Constitutional errors as the result of prosecutorial misconduct. Each one rising to a level of prejudice that made it nearly impossible for a jury to judge Correctly or even act Correctly.

7). The petitioner Suffered a number of Constitutional errors at the hands of a jury that Conducted outside investigations for the purpose of advocating the Case of the prosecution. Each juror in their own way, brought into the trial, an evidentiary Conclusion of their own and so infected the other jurors and the verdict.

48

8). The petitioners Constitutional rights were assaulted by all parties. The (defense Counsel), (Prosecution), (Jury), and by a Court who allowed prosecution and jury misconduct to go unchecked. The prejudice suffered by the petitioner was monumental in the sense that a multitude of Constitutional error resulted. The High Courts have Concluded that:

> "The defendants liberty depends on his ability to present his case in the face of the intricate aspects of the law and the advocacy of the public prosecutor. A criminal ▓▓▓ trial is thus not conducted in accord with due process of law unless the defendant has Counsel to represent him." (Evits V. Lucey, 469 U.S. 387 83 L.Ed.2d 821, at 835 (1985). Quoting, (United States v. Ash, 413 U.S. 300, at 309.).

Also;

> "Counsel has a duty to bring to bear such skill and Knowledge as will render the trial a reliable adversarial testing process."
> And the benchmark for judging ineffectiveness must be whether Counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied upon as having just results. (Strickland V. Washington, 466 U.S. 668, 104 S.Ct., at 2064.)

49

## X

## THE LOWER COURT ERRORED IN DENYING PETITIONERS ASSERTION OF HIS UNFORFEITED CONSTITUTIONAL RIGHT OF SELF-REPRESENTATION.

On June 2, 2003, the petitioner asked the Court to accept his motion to go (Pro-Se) Self-Representation. The Court asked the petitioner if he was ready to proceed at this time (Pro-Se). The petitioner stated that he would need 90-days to prepare. The Court dismissed petitioners request as untimely. The Appellate Court agreed with the trial Court that the petitioner failed to file motion within a reasonable amount of time prior to trial. The appellate court argues that from the day the trial was set, march 18, 2003, until the day of trial on June 2, 2003, the petitioner never notified the Court, or expressed to defense Counsel his desire to represent himself.

The petitioner contends that neither one of these issues, had he done them, would have made a difference. Because the Court did not inquire about petitioner mentioning desire to go pro-se after the trial date was set, or did petitioner try to write the Court after the trial date was set. The Court did not ask the petitioner if he tried to notify anyone that he wanted to go pro-se once he found out that a trial date had been set. There was no inquiry what so ever, by the Court to determine my reasons for not requesting to go pro-se earlier.

1   There were only two issues the Court addressed concerning
2   petitioners denial of self-representation. The first was that
3   there was a trial courtroom available, and my case is scheduled
4   to go in there. And secondly; the motion is untimely, and
5   therefore denied.

6   What has been lost in all this is the petitioners reasons for
7   wanting to go (pro-se), and why petitioner never notified the
8   Court earlier that he wanted to go (pro-se). The petitioner had
9   a very strained and unbearable relationship with his original
10  defense attorney Maxine Fassulis of the Oakland Public Defenders
11  Office. On May 21, 2002, at the beginning of petitioners "Preliminary
12  Hearing". The petitioner had a "Marsden Hearing" to remove defense
13  counsel off of his case. The Court denied petitioners request and
14  proceeded with the preliminary hearing. From that point forward
15  there was tension between petitioner and attorney Fassulis. The Court
16  records noted that petitioner had not been brought into courtroom
17  for seven months prior to trial. His last appearance in open court was
18  November 13, 2002 (CT-378). He was never brought into the courtroom
19  on, December 18, 2002 (CT-381), January 23, 2003 (CT-384) March 18, 2003
20  (CT-387). It was on March 18, 2003 that the case was set for trial
21  on June 2, 2003 (CT-387).

22  Petitioner told his attorney, Mrs. Fassulis, that he was going
23  to renew his Marsden motion for relief of counsel in Superior
24  Court. The attorney told the petitioner the Court would hold him
25  in contempt and not allow him to be present in his own trial if he
26  asked for a Marsden hearing in Superior Court. So attorney Fassulis
27  never allowed petitioner to come to open court. Petitioner sent
28  several complaints to the Public Def. Office that were never answered.

On March 17, 2003 the petitioner told his attorney that he would be submitting a motion for (Pro-Se) Self-representation on the following day. Which would be his March 18, 2003 Court date. Three things followed: 1). The petitioner was never brought into open Court. 2) A trial date was set without him ever knowing; and 3). Attorney Maxine Fassulis was taken off his case. What is important to note is that not only was petitioner never brought into the Courtroom on March 18, 2003. The whole matter was never reported on the record. (CT-387) The contention is that this is not just Unconstitutional. But Corrupt as well. Petitioner was intentionally held out of Court for seven months, and then blind-sided.

The appellate Court in their opinion cited:

> "For example, a defendant should not be
> permitted to ▪▪▪▪▪ wait until the day preceding
> of trial before he moves to represent himself
> and request a Continuance in order to prepare
> for trial without some showing of reasonable
> Cause for the lateness of the request." See (P. 5-[*14]
> of appellate denial.) Quoting (People v. Windham, 1977, 19
> Cal. 3d at 128 n. 5.)

But when we look closely at the facts of the petitioners case, there is no way possible to miss the fact that petitioner was being denied the opportunity to be present in Court. The appellate Court has not practiced or applied the very standard that it has advocated. It is quite clear that the petitioner had a "reasonable Cause" for the lateness of his request to go (Pro-Se).

Its not true that petitioners newly appointed counsel, Judith Browne, spoke with petitioner about his case for several hours prior to his trial date. Petitioner stated on the record on June 2, 2003, that attorney Judith Browne had not spoke about the case with him on that one visit before the trial because Mrs. Browne said she had not yet reviewed or received his file. After the way the Public Defenders Office had treated the petitioner, he had no words for nobody but the court. The visit with Mrs. Browne was a matter of 10-minutes or less. Not several hours as stated in the appellate's opinion. The 50-year plea bargain by the court on the day of trial was not the reason petitioner wanted or decided to go (Pro-se). The petitioner was offered the one time deal on the spot. The letter from attorney Fassulis did not mention a 50-year deal. The new attorney Mrs. Browne did not come with the 50-year deal on her visit with petitioner. There is no record of a deal prior to the first day of trial. The petitioner entered the courtroom for the first time in seven months with his motion filled out and signed.

How, then, does one properly characterize a Faretta motion on the day set for trial, where trial has not been assigned, where the defendant has offered a compelling explanation for its timing, and where there is nothing in the record to support a finding of a dilatory intent. The petitioner can not be said to have "forfeited" his right of self-representation, where he never before had an adequate opportunity previously to assert it.

The opinion by the appellat Court of Appeals does not address whether the petitioners circumstances constituted a "showing of reasonable cause for the lateness of the request."

"The language and spirit of the Sixth Amendment
contemplate that counsel, like the other defense
tools guaranteed by the Amendment, shall be an
aid to a willing defendant-- not an organ of
state interposed between an unwilling defen-
dant and his right to defend himself personally.
To thrust counsel upon the accused, against
his considered wish, thus violates the logic
of the Amendment. In such a case, counsel
is not an assistant, but a master; and the right
to make a defense is stripped of the personal
character upon which the Amendment insists."
(Faretta v. California, 1975, 422 U.S. 806, at 820)

The final contention of this issue is that the trial court
allowed attorney Fassulis to conduct affairs without the petiti-
oner present in court. This was done over and over until the judge
and the attorney Fassulis performed the final blow. Which was a
trial setting date of June 2, 2003. But the hearing was conducted
without the petitioner present in court, and the whole proceeding
was conducted off the record. The Court of Appeals have overlooked
these facts. And by doing so have allowed the petitioner to suffer
a constitutional denial.

## XI

## PETITIONERS FOURTEENTH AMENDMENT DUE PROCESS AND EQUAL PROTECTION RIGHTS WERE VIOLATED DEPRIVING HIM THE RIGHT TO ASSERT HIS RIGHT TO SELF-REPRESENTATION.

On many occasions when the petitioners case was on the Court Calendar, he was not brought into the Courtroom. And on March 18, 2003, when the petitioners trial date was set, not only was petitioner not brought out to the Courtroom, but the whole matter Was Conducted off the record.

However, penol code Section 977, Subdivision (b) provides in relevant part:

> (b) In all cases in which a felony is Charged, the accused must be present at the arraignment, ... during those portions of the trial when evidence is taken ..., and at the time of imposition of Sentence. The accused Shall be personally present at all other proceedings unless he Shall, with leave of Court, execute in open Court, a written waiver of his right to be personally present, approved by his Counsel, which waiver must then be filed with the Court.

Moreover, there is a Fourteenth Amendment to be present. As explained by the United States Supreme Court in (United States v. Gagnon, 1985, 470 U.S. 522, at 526.)

55

The Constitutional right to presence is rooted to a large extent in the "Confrontation Clause" of the Sixth Amendment. But we have recognized that this right is protected by the "Due Process Clause" in some situations where the defendant is not actually confronting witnesses or evidence against him. In (Snyder v. Massachusetts, 291 U.S. 97, (1934), the Court explained that a defendant has a due process right to be present at a proceeding "Whenever his presence has a relation, reasonably substantial, to the fullness of his oppertunity defend against the charge ... The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id., at 105-106.

This same right was subsequently summarized by the Court in (Kentucky v. Stincer, 1987, 482 U.S. 730, 745:

"Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if this presence would contribute to the fairness of the procedure"

Finally, there is a "Equal Protection Clause" issue arising in this situation. If in-custody criminal defendants will suffer a disability by reason of not being present in the Courtroom at trial-setting hearings, and if out-of-custody defendants will confront no such disability because physically present with counsel (as section 977 requires), the issue arises whether "similarly situated"

56

defendants have received disparate treatment which can be justified under the Fourteenth Amendment.

The Fourteenth Amendment "Equal Protection Clause" requires that persons "similarly situated" receive equal treatment. See (Skinner v. Oklahoma, 1942, 316 U.S. 535.) State action which impinges on a fundamental right is subject to "strict scrutiny" and is permissible only if necessary to "further a compelling state interest". (Kramer v. Union Free School Dist. (1969) 395 U.S. 621, 626-627. State action in a criminal context which discriminates based on "poverty" involves a "suspect classification", which must be evaluated under this strict standard. (In re Antazo, (1970) 3 Cal. 3d 100, 110-112.

> • Under the strict standard applied in such cases, the State bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose.
> (Westbrook v. Mihaly [(1970)] 2 Cal. 3d [765] at pp. 784-785.)

(D'Amico v. Board of Medical Examiners, 1974, 11 Cal. 3d 1, 17).

The issue is whether there is a rational justification, let alone a compelling state interest, in applying the Faretta forfeiture rule to persons in petitioners situation -- unable to make bail and accordingly left at the mercy of a lower court as to whether they would appear at a trial-setting -- and the more affluent counterpart who posted bail and was required by law to be present at the trial setting.

In their Opinion Concerning this issue the appellate Court states that petitioner cannot establish that he would have asserted his Faretta rights had he been present in Court on March 18, 2003. Also, that petitioner failed to make any effort to tell his newly appointed attorney about his desire to go (Pro-se), or try and notify the Court between March 18, 2003, and June 2, 2003.

The petitioner addresses this by saying that if the petitioner could not get inside the Courtroom on his scheduled Court date after he told his attorney that he was going to go (Pro-se). Should the petitioner then expect that a special Court date would be arranged by the Court so he could come in and be granted his (Pro-se) status. This is very unlikely.

The petitioners Marsden hearing on the day of his preliminary hearing is proof that he disapproved of his defense Counsel more than one year before the trial date was set.

The fact that petitioner was held out of Court for seven months straight shows an abnormal pattern that is contrary to Code § 977, because there is no record of petitioner ever signing a waiver which is suppose to be standard practice and procedure under Code § 977.

The fact that he was held out of court on the trial-setting date. And the trial-setting hearing was off the record. This shows that the Superior Court judge was not operating within the perimeters of the United States Contitution.

The petitioners case was sabotaged. And there was no overiding State interest that justfied these actions.

# PRAYER FOR RELIEF

Petitioner is without remedy save by Writ of Habeas Corpus.

Wherefore, petitioner prays the Court:

1). Issue petitioner forthwith release from the wrongful prosecution setting petitioner at liberty.

2). Issue an order to show cause for the detainment of petitioner upon the director of CDCR.

3) Issue an Order for an Evidentiary Hearing.


Dated: April 3, 2008

By  Sherman Level Davis
CDC# D-40369

Pro-Per

# VERIFICATION

Sherman Level Davis

I am the petitioner in this action. I have read the foregoing petition for writ of habeas corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Corcoran California on (4-3-08).

Sherman Level Davis
Petitioner

CDC# D-40369
Number

# EXHIBIT -1

2- Pages

(RCD-8/00)

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff          Dept. No. 006

vs.                                                        Case No. **143004**

**SHERMAN LEVEL DAVIS**, Defendant

---

# REQUEST BY THE JURY

In the above-entitled cause, request the following:


Can we see the Ford Probe (car) in person?


Dated: August 06|03                    Juror No.: 1

Time: 10:25 A.M.


Jury Request

(RCD-8/00)

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff    Dept. No. 006

vs.    Case No. **143004**

**SHERMAN LEVEL DAVIS**, Defendant

## REQUEST BY THE JURY

In the above-entitled cause, request the following:

We, the Jury, cannot reach a unanimous decision on counts 12 and 13.

If you feel further deliberation on counts 12 & 13 would not be fruitful then return verdicts on those counts you have.

Dated: August 06/03

Time: 1:50 P.m.

Juror No.: No. 1

Jury Request

# EXHIBIT - 2
## 5- Pages

911 DISPATCH TAPE TRANSCRIPTION

PEOPLE v. Sherman Davis

Court & Docket No.   143004

Attorney:  Judy Browne

Transcribed by: Public Defender's Office
Date Transcribed:   July 16, 2003
JB:aa

| | | |
|---|---|---|
| 1 | Q: | Hello. |
| 2 | A: | Go ahead (inaudible) transferring, a 211 armed just occurred. |
| 3 | Q: | Okay, thank you. Where? |
| 4 | A: | We, we are across from Safeway, there are women . We are in the bathroom, he locked us in. |
| 5 | | He slugged me, okay. He's got a gun. He left (inaudible) ago |
| 6 | Q: | Ma'am, ma'am, what business are you in? |
| 7 | A: | It's called "Ovation" it's a clothing store. |
| 8 | Q: | "Ovation"? |
| 9 | A: | "Ovation" clothing store. It, it's (inaudible) |
| 10 | Q: | Having a really hard time hearing you. |
| 11 | A: | Can you hear me? |
| 12 | Q: | Yeah, go ahead. |
| 13 | A: | Okay, between Alcatraz and Claremont. |
| 14 | Q: | Between Alcatraz and Claremont? |
| 15 | A: | Yeah. |
| 16 | Q: | Okay. |
| 17 | A: | We're in the bathroom back here, he had a gun, and he slugged me also. |
| 18 | Q: | Okay. |
| 19 | A: | (Inaudible) if you wait any longer... |
| 20 | Q: | Do you know what your uh, address is there ma'am? |
| 21 | A: | I beg your pardon? |
| 22 | Q: | Do you know the address of your store? |
| 23 | A: | What's the address?  3206 College Avenue. It's North Oakland, I'm at the beginning of |
| 24 | | Oakland. The Rockridge area. (Inaudible) |
| 25 | Q: | Yeah, okay. You're talking to Berkeley Police, I'm trying to get as much information as I can |
| 26 | | ma'am so I can give it to Oakland and get people out to you. |
| 27 | A: | Berkeley, Berkeley. 3206 (Inaudible) |

1  Q:    (Berkeley Dispatch) Okay, 211 just occurred (Inaudible) they're locked uh, they're locked inside

2        the uh closet (inaudible).

3  Q:    Okay ma'am...

4  A:    Yes?

5  Q:    How many people were there?

6  A:    Four (inaudible) one man, one man (inaudible).

7  Q:    What race were they?

8  A:    He was black.

9  Q:    How old?

10 A:    (Inaudible background voices) leather jacket, moustache, muscular.  We don't know if he's out in

11       front.  (Inaudible)

12 Q:    (Inaudible) What type...did he have a revolver, pistol?

13 A:    He had (inaudible background voices)...

14 Q:    Having a real hard time hearing you here.

15 A:    Well they are saying a big black gun, like a handgun, or a magnum or something, I don't know.  I

16       didn't see the gun, I just...

17 Q:    And what (inaudible), where are you at in the store?

18 A:    We're in the bathroom, way back in the bathroom, right in the bathroom, we locked ourselves in.

19       He told us to get in the bathroom so he could get away.

20 Q:    Okay, besides the one, did you see anybody else besides the one man?

21 A:    We, we just saw, well okay, I'm going to put you on to the owner and she's going to talk with

22       you, okay well, okay hang on (inaudible).

23 A:    (Owner) Hello.

24 Q:    (Dispatch) Hi, I know this is frustrating, we've got police on the way, but I need to try to get as

25       much of a description as I can.  Okay, th, the  first man that we saw was a black male adult. How

26       old was he?

27 A:    He was probably what, 35?  Thirty five, uh, black hair, black man, black moustache.

1   Q:   How tall?

2   A:   Uh, about 5' 10". (Inaudible background voices).

3   Q:   Ma'am what was he wearing?

4   A:   Black leather jacket.

5   Q:   Okay.  What type of pants?

6   A:   (Inaudible background voices) what kind of pants...

7   Q:   What color was his t-shirt?

8   A:   Black pants, everything was black I think.  He had a cap on his head.

9   Q:   What color cap?

10  A:   I didn't see the cap (inaudible background voices).  Black cap...(inaudible background voices).

11  Q:   Okay.  He was holding the gun?

12  A:   Yes, (inaudible).

13  Q:   Which hand was he holding the hand in?

14  A:   Uh, what hand, I believe it was the right hand.  Was he holding the gun in his right hand?

15       (Inaudible background voices).

16  Q:   What did he take from you?

17  A:   He uh, had me open the register and take everything out...

18  Q:   I'm sorry, ma'am?

19  A:   He had us open the register and take everything out.  And then he asked for uh, made everyone

20       uh, give him their wallets and money in their wallets.  And one woman uh, said something to him

21       he didn't like and he did hit her.  (Inaudible background voices).

22  Q:   How many people are in the bathroom?

23  A:   Four.

24  Q:   Does she need uh, medical attention?

25  A:   No, I don't think she needs uh, medical attention.  Uh, she might later.  You feel like you need

26       medical attention?  (Background voices inaudible) She said no.  But she didn't want to come in

27

3

1    the bathroom, he said you know, you bitch, or you know, get your fuckin' body back here, then

2    he smacked her.

3  Q:    Okay. (Inaudible) where did he hit her?

4  A:    I'm sorry...

5  Q:    Where did he hit her?  In the...

6  A:    In her jaw and neck.

7  Q:    Okay.

8  A:    Left jaw and neck.

9  Q:    I'll go ahead and have an ambulance come out as well.  Our officers are on the scene, they're

10    approaching the building now.  Now I want all you guys to stay in the bathroom until the officers

11    come to get you, okay?

12  A:    Okay, does he know right where we are?

13  Q:    Yeah, but I'm not going to let you off the phone until the cops come to you.

14  A:    Okay. (Background voices inaudible)

15  Q:    Yeah, I just hope that...

16  A:    Hello.

17  Q:    Yes.

18  A:    Medical, a 211 victim.  (Background voices inaudible) No have him (inaudible)

19  Q:    (Dispatch) What's your name ma'am?

20  A:    My name is Lesley.  L-e-s-l-e-y.

21  Q:    (Dispatch) Uh, um (affirm)

22  A:    Pulaski, P-u-l-a-s-k-i.

23  Q:    And what cell phone number are you calling on right now?

24  A:    Uh, what phone number...

25  Q:    (Dispatch) That's alright, don't worry if you don't know it.  What's the name of your business?

26    It's Ovation?

27  A:    It's called Ovation, O-v-a-t-i-o-n.  It's uh, almost to the corner on Alcatraz.

1    Q:    Yeah, our officers are out there now, they're trying to get in. Um, they should be coming in the

2          door in a minute, or you will hear them in the door. They don't know if this guy's still inside the

3          store.

4    A:    No, but I, I would...he said get back there (inaudible). If we don't get her back there, if I don't

5          get her back there, he'll have to kill her and that he wants to just be able to get away. So that's

6          what I (inaudible) he just fled. However, I can't promise you that at all. (Background voices

7          inaudible). They're coming. (Inaudible background voices).

8    Q:    Just try to, to let them know I'm just taking information from you. The police officers in the

9          field they're already out there. They're looking around for the guy right now. They want to

10        make sure he's not in the store before they bring you guys out.

11    A:    (Inaudible background voices).

12    Q:    The way this works is that I'm on one computer typing the information and there's a dispatcher

13        talking to the cops in the field on the other end, so.

14    Q:    Did this guy have any...they're still locked in the bathroom.

15    A:    (Background voices inaudible).

16    Q:    This is Ovation at 3206 College Avenue, correct?

17    A:    That's correct.

18    Q:    If they're inside, they're not supposed to be there. They've walked in after the robbery. These

19        people are still locked in the bathroom in the back of the store.

20    A:    Yeah there could be customers out in the front.

21    Q:    Yeah, apparently there's customers that walked into your store. Just um...

22    A:    I don't know if (inaudible) one says that it is, but it isn't. (Inaudible).

23    Q:    Do you hear anybody outside ma'am, outside the door?

24    A:    (Background voices inaudible) Is the door, the door open (inaudible). Hello, (inaudible) oh, are

25        you there? (Background voices inaudible).

26    Q:    Is that the cop there?

27    A:    Yeah.

1  Q:    Okay ma'am, I going to hang up the phone.  You take care.

2  A:    Thank you.

3  Q:    Alright bye, bye.

# EXHIBIT-3

2-Pages

# REPORT OF INTERVIEW

## I. DATE: 12/4/03

CLIENT:      Sherman Davis
ATTY:        Judy Browne
INV. #:      I-02-215
DOCKET:      143004
Dictation Date:   -
Date Typed:   12/4/03

| PC 1054.8 Requirements | |
|---|---|
| (Personal/Phone Interview) | (Initials) |
| I.D. Self | |
| I.D. Agency | |
| (Personal Interview) | |
| Provide Business Card | _____ |
| Show I.D. | _____ |

Subject:            Stacy
Subject's Address:
Location of Interview:
Time of Interview:   1030 hrs

FILE

INVESTIGATOR:    Paul Perez

Witness Stacy Ramirez stated that she understood her right not to talk to the Alameda County Public Defenders Office regarding the Sherman Davis case but stated that she was willing to be interviewed. Witness Stacy Ramirez stated that she did not go out scouting for cars but when she saw cars with colors similar to the colors in question, it drew her attention to the car color but she did not bring those observations into the deliberations. Witness Ramirez said that she made her decisions based on photos presented to her at trial.

Witness Stacy Ramirez stated that during their deliberations, jury foreperson David Le Claire told the group that he saw a parked car at a BART parking lot which was either gold or silver in color and spent some time looking at it. Witness Ramirez said that Mr. Le Claire told the group that after he made his observations of this car he was convinced that the colors gold and silver looked similar under certain conditions and it made him feel *"warm and fuzzy"* about his decision. Witness Ramirez said that she also heard Witness Le Claire talk about this car he observed at the BART parking lot after the trial in front of the judge and jury and she was surprised that he said those things in the court room.

Witness Stacy Ramirez said that in regards to her decision making there was not a lot of physical evidence in this case. However, the testimony of witnesses and the consistency of events as well as items found at the scenes including our client's clothing influenced her decision making during deliberations.

Witness Stacy Ramirez said that during deliberations an issue came up regarding the sexual assault. Witness Ramirez said that juror Sharon Layden told the group that she either had a friend or knew of someone who worked at a clinic that dealt with sexual assaults and that she had some knowledge in this area, but Witness Ramirez could not recall what the details juror Sharon Layden shared with the group.

# REPORT OF INTERVIEW

Witness Stacy Ramirez stated that during deliberations, juror James Curtis told the group that he had gone to a paint store on personal business and while there asked someone at the store if the colors gold and silver could be mistaken for each other. Witness Ramirez said that she does not recall what opinion juror James Curtis got from the store person, but he shared this opinion with the group and it was not favorable to our client.

Witness Stacy Ramirez said that the car was a big issue to her in this case and she could not say if the aforementioned jurors opinions based on outside information had any bearing on her fellow jurors decision in this case. Witness Ramirez said that she did in fact receive a letter from the Alameda County District Attorney in this case and was told that she may be contacted by the Alameda County Public Defender. Witness Ramirez said that she was asked to call the District Attorney after she was contacted by the Alameda County Public Defender in this matter.

**REPORT OF INTERVIEW**

# EXHiBiT-4
## 10-Pages

## NOTICE

The petitioner comes to this Court with a Mixed-Petition due to circumstances beyond his control, that affected his ability to exhaust state remedies before pursuing federal relief. The reason petitioner did not pursue the un-exhausted claims at this time is because when the petitioner addressed this very Court earlier. It was for an extension of time to prepare. See attachement.

Because the Court dismissed my request without prejudice, to petitioner filing a petition for writ of habeas Corpus. And granted application to proceed forma pauperis. I felt that now that all of my legal materials were returned to me by the California Attorney General. See attached. It was important that petitioner excercise complete diligence in getting his completed habeas Corpus to this Court.

The petitioner now appeals to the Court to allow me to exhaust issues (1 thru 9) on the state level. See (Slack v. McDaniel, 2009 529 U.S. 473)

The petitioner is in the worst maximum security prison in California and asks this Court to excuse the fact that there is only one copy of this habeas Corpus. It is nearly impossible to get scheduled for the law library.

The petitioner has researched case law concerning new procedures and understands that if petitioner is allowed to go back down to the state Courts and exhaust state remedies. That process must be done with great diligence by the petitioner.          Thank you.

NOTE: The actual Arguement is only (50-pages)

_Sherman Level Davis_

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  SHERMAN L. DAVIS,                    )    No. C 07-4447 MJJ (PR)

10                    Petitioner,       )

                                        )    **ORDER OF DISMISSAL**

11  v.                                  )

12  STATE OF CALIFORNIA,                )

13                    Respondent.       )

14  _____    )

15         This case was opened when petitioner filed a document titled "Motion an

16  Declaration of Good Cause for Equitable Tolling and Extension of Time to File Federal

17  Petition – Criminal Conviction."  In this motion, petitioner seeks to toll the running of the

18  statute of limitations for a federal habeas petition he wishes to file in the future.

19         Article III, Section 2 of the United States Constitution restricts adjudication in

20  federal courts to "Cases" and "Controversies."  See Valley Forge Christian College v.

21  Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).  In

22  the absence of an actual petition for a writ of habeas corpus or other civil complaint, there

23  is no case or controversy for this Court to adjudicate.  See Green v. United States, 260

24  F.3d 78, 82 (2d Cir. 2001).  Although, in some instances, a motion may be construed to

25  be a petition for a writ of habeas corpus, see id. at 83-84, petitioner here has not alleged

26  any grounds for such relief, and indeed it is clear that he is not asking for relief from his

27  conviction, but rather from the applicable statute of limitations.  Moreover, the Court

28  cannot discern from the instant filing whether petitioner can meet even the most basic

G:\PRO-SE\MJJ\HC.07\davis.dsm.wpd

1  requirements for proceeding with a habeas petition in federal court and, in particular, in
2  the Northern District, such as proper jurisdiction and venue.  Consequently, the motion
3  will not be construed as a habeas petition.

4      Accordingly, the above-titled action is hereby DISMISSED without prejudice to
5  petitioner's filing a petition for a writ of habeas corpus or a complaint for other relief.
6  The application to proceed in forma pauperis is hereby GRANTED.

7      This order terminates all pending motions.

8      The Clerk shall close the file.

9      IT IS SO ORDERED.

10 DATED: 10/2/2007

MARTIN J. JENKINS
United States District Judge

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SHERMAN LEVEL DAVIS,

              Plaintiff,

   v.

PEOPLE OF THE STATE OF CALIFORNIA
et al,

              Defendant.
_____/

Case Number: CV07-04447 MJJ

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 3, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Sherman Level Davis
Corcoran State Prison
Prisoner Id D-40369
P.O. Box 3476
(4A2L-22)
Corcoran, CA 93212

Dated: October 3, 2007

Richard W. Wieking, Clerk
By: R.B. Espinosa, Deputy Clerk

1   Sherman Level Davis

2   In Pro. Per.

3   Corcoran State Prison California

4   P.O. Box 3476

5   Corcoran, CA. 93212

6

7       United States District Court

8       for the Northern District.

9

FILED

07 AUG 28 PH 1:3☐
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

MJJ   (PR)

C 07 4447

Case No. A105394

10  People of the State of

11  California,

12        Plaintiff and

13            Respondant,

14

15  vs.

16

17  Sherman Level Davis☐

18        Defendant and

19            Appellant.

20  _____/

Alameda County

No. 143004

21

22        Motion And Declaration Of Good Cause

23  For "Equitable Tolling" And Extension Of Time

24  To File Federal Petition - Criminal Conviction.

25

26  ①. I, the petitioner, Sherman Level Davis, hereby move for an

27  'extension' and 'equitable tolling' to file Federal Petition in regards

28  to Criminal Conviction.

①

1  ②. The Petition For Review received a docket number on 11/23/05.
2      The California State Supreme Court denied it on 2/4/06. See
3      (Exhibit-1).

4  ③. The petitioner was four months into his one year filing statute
5      under the "1996 (AEDPA)." And on 6/15/06, the petitioner was
6      transferred from Pleasant Valley State Prison, to Corcoran State
7      Prison California.

8  ④. Petitioner begin submitting requests for his legal. Asking why it
9      was taking so long to be processed by prison staff. The petition-
10     er was told that his property was lost. So petitioner begin the
11     appeal process concerning his legal property. See (Exhibit-2).
12     Five pages of documents.

13 ⑤. Kern County California, Superior Court Judge "Lynn C. Atkins"
14     ordered the California Attorney General to submit an "informal response."
15     That resulted in petitioner receiving two boxes of property from
16     Pleasant Valley State Prison, that contained "police reports" and legal
17     notes. See (Exhibit-3(A). And on 8/6/07, the petitioner received
18     from the California Attorney General's office copies of the
19     following legal material.

20 Ⓐ. Oppening Appellant Brief (People v. Davis), NO. A105394
21 Ⓑ. Respondent's Brief, (People v. Davis) NO. A105394
22 Ⓒ. Decision, (People v. Davis), NO. A105394
23 Ⓓ. Petition For Re-hearing, (People v. Davis), NO. A105394
24 Ⓔ. Petition For Review, (People v. Davis), NO. A105394
25 Ⓕ. Trial Transcript, (People v. Davis), No. 143004, (Oakland Superior Court)

26 ⑥. On (Exhibit-3(B), in paragraph one. The California Attorney Gen-
27     eral states: "That the legal documents that had been inadvertantly
28     lost by Corcoran State Prison has been sent to petitioner.

②

⑦. On 8/6/07, petitioner received and signed for an overnight shipped package containing all of his legal material had been lost since 6/15/06. (Exhibits - 3(A) (B) (C) (D) and (E)

⑧. The petitioner is contending that "extraordinary circumstances" prevented him from having access to his legal materials. Corcoran State Prison lost all of his transcripts, briefs, law books, law manuals, case law, and the writ that he was preparing for his Federal Petition. There was an additional two boxes of petitioners personal property that contained arrest reports, line-ups, and trial notes that was held in Pleasant Valley State Prison since 7/20/05.

⑨. Petitioner arrived at Corcoran State Prison on 6/15/06. With a total of eight months remaining on his one year statute of limitations for filing a Federal Habeas. Petitioner is serving a (443-years) to Life sentence. And it was a total nightmare watching those eight months pass by with nothing he could do to help himself.

⑩. Petitioner exhausted his remedies in the prison appeal system. And eventually found relief in Kern County California Superior Court under Judge Lynn C. Atkins. In (Exhibit-3), (B-thru-E). The California Attorney General acknowledges that Corcoran State Prison inadvertantly lost petitioner legal property. And confirmed that on 8/3/07. The Attorney General had shipped to the petitioner the remainder of all the legal material that had been lost.

⑪. The petitioner therefore "prays" that the Federal District Court of the Northern District. Please grant the petitioner the remaining eight months of his one year statute under the (AEDPA). Eight months from the day petitioner signed and took possession of his legal material. On 8/6/07. A filing deadline of 4/6/08.

③

1
2
3

4        I declare under penalty of perjury under the laws of
5 the State of California that the foregoing is true and correct.

6

7        Executed

8

9

10

11 Date:

12                                    Sherman Level Davis
13                                    In Pro. Per.  D-40369
14                                    Corcoran State Prison
15                                    P.O. Box 3476 (4A2L-22)
16                                    Corcoran, CA. 93212

17

18

19

20

21

22

23

24

25

26

27

28

**EDMUND G. BROWN JR.**
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5774

E-Mail: Stacey.Schesser@doj.ca.gov

August 3, 2007

The Honorable Lynn C. Atkinson
Kings County Superior Court
1426 South Drive
Hanford, CA 93230-5997

RE:    FOLLOW-UP RESPONSE
       **In re Sherman Level Davis, Case No. 07W0048A**

Dear Judge Atkinson:

This letter serves to inform the Court that Respondent has delivered to Sherman Level Davis all requested documents that may have been inadvertently lost by prison officials in inmate Davis's transport to Corcoran State Prison. (Exh. 1 – Mail Receipt.) Respondent informed the Court in a letter dated July 20, 2007 that it was in the process of providing Davis with documents he requested and the process of copying and sending Davis the below listed documentation is now complete.

Davis will be receiving:

1.) Opening Appellant Brief, *People v. Davis*, Case Number A105394
2.) Respondent's Brief, *People v. Davis*, Case Number A105394[1]
3.) Decision, *People v. Davis*, Case Number A105394
4.) Petition for Re-hearing, *People v. Davis*, Case Number A105394
5.) Petition for review, *People v. Davis*, Case Number A105394
6.) Trial Transcript, *People v. Davis*, Case Number 143004 (Alameda Superior Court)

---

1. Attached to the July 20, 2007 informal response as Exhibit 2.

California Overnight Shipping Label



1-800-334-5000 / www.calover.com

Date Printed 8/3/2007

*Shipped From:*
CALIFORNIA ATTORNEY GENERAL'S
455 GOLDEN GATE AVE
SAN FRANCISCO, CA 94102



D10010140397872

Tracking#D10010140397872

*Sent By:* STACEY SCHESSER
*Phone#:* (415)703-5774
*wgt(lbs):* 0
*Reference:* 48101270SF2007200363-DAVIS

---

*Ship To Company:*
**CALIF. STATE PRISON, CORCORAN**
**4001 KING AVENUE**
**CORCORAN, CA 93212**
**SCOTT ALTNOW (559)992-6174**

*Service:* **S**
*Sort Code:* **VIS**

*Special Services:*
  **Signature Required**

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **In re Davis**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>August 3, 2007,</u> I served the attached

### FOLLOW-UP RESPONSE

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Sherman Level Davis**
**D-40369**
**California State Prison, Corcoran**
**P.O. Box 8800**
**Corcoran, CA  93212**
*in pro per*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 3, 2007, at San Francisco, California.

| | |
|---|---|
| L. Santos | *d - Santos* |
| Declarant | Signature |

20098910.wpd

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

### (Fed. R. Civ. P. 5; 28 U.S.C. 1746)

I, **Sherman Level Davis**_____, declare that I am over 18

years of age and a party to this action.  I am a resident of : **CSP- Corcoran**_____

_____,

in the County of : **Kings County**_____,

State of California.  My prison address is : **P.O. Box 3481**_____

_____**4B2L-1**_____

_____**Corcoran, CA. 93212**_____

_____

On **April 3**_____, 20**08**, I served the attached : **Federal Habeas Corpus**

**Northern District**_____

(Describe Document)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope , with

postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named

Correctional Institution in which I am presently confined.  The envelope is addressed as follows :

**United States District Court for the Northern District**

**U.S. Courthouse**

**450 Golden Gate Avenue**

**San Francisco, CA. 94102-3483**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is

true and correct.

Executed on **April 3, 2008**_____    **Sherman Level Davis**_____
(Date)                              (Declarant's Signature)

# TABLE OF CONTENTS

| | "Pages" |
|---|---|
| Habeas L.R. 2254-3(a) | 1-7 |
| (I). Failure To Call Witnesses: | 8 |
| A). | 8 |
| B). | 9 |
| C)E-filing | 10 |
| D). | 11 |
| (II). Failure To Present Evidence: | 13 |
| A). | 13 |
| B). | 15 |
| C). | 15 |
| (III). Failure To Impeach: | 16 |
| A). | 16 |
| B). | 16 |
| C). | 17 |
| (IV). Failure To Suppress: | 19 |
| A). | 19 |
| B). | 20 |
| C). | 21 |
| (V). Prosecutorial Misconduct: | 22 |
| A). | 22 |
| B). | 23 |
| C). | 26 |
| D). | 29 |
| (VI). Jury Misconduct: | 32 |
| A)., B). | 32 |
| C). | 34 |

CW

CV 08        1978

(PR)

# TABLE OF CONTENTS

(VII). Failure to Investigate Jury Misconduct:    37

(VIII). Failure to Conduct Pre-Trial Investigation:    41

A).    41

B).    42

C)., D)., and E).    43

F).    44

6). Conflict of Interest:    45

(IX). Cumulative Effect:    47

①,②    47

③,④,⑤,⑥,⑦    48

(X). Faretta Rights:    50

(XI). Equal Protection and Due Process Violations:    55

# TABLE OF AUTHORITIES

Washington v. Texas, 388 U.S. 14 (1967)    8,12

In re Martin, 1987, 44 Cal. 3d.1, 744 P.2d 374)    12

Strickland v. Washington, 1984, 466 U.S. 688)    8,13-15,18,20,31,46

Ky v. Stincer, 1987, 482 U.S. 730, 737.)    17

Kimmelman v. Morrison, 1984, 104 S.Ct. 2039).    18

United States v. Cronic, 1984, 466 U.S. 648)    20

United States v. Young, 1985, 470 U.S. 1)    24

Berger v. United States, 295 U.S. 78)    25

U.S. v. Ruiz, 2000, 536 U.S. 622    28

Brady v. Maryland, 1963, 373 U.S. 83    28

ii

# TABLE OF AUTHORITIES

"Pages"

Greer V. Miller, 483 U.S. 756) — 31

Remmer V. United States, 1954, 347 U.S. 227) — 33

McDonough Power Equip. V. Greenwood, 464 U.S. 548 (1984) — 35

Mickens V. Taylor, 535 U.S. 162) — 46

Holloway V. Arkansas, 435 U.S. 475) — 46

Evits V. Lucey, 1985, 469 U.S. 387) — 49

United States V. Ash, 413 U.S. 300) — 49

Faretta V. California, 1975, 422 U.S. 806) — 54

Snyder V. Massachusetts, 1934, 291 U.S. 97) — 56

Kentucky V. Stincer, 1987, 482 U.S. 730) — 56

Skinner V. Oklahoma, 1942, 316 U.S. 535) — 57

Kramer V. Union Free School District, 1969, 395 U.S. 621 — 57

U.S. V. Weatherspoon, 410 F.3d 1142 (9th Cir. 2005) — 25

Allen V. Woodford, 395 F.3d 979 (9th Cir. 2005) — 25

U.S. V. Garcia Guizar, 160 F.3d 511 (9th Cir. 1998) — 25

Dyer V. Calderon, 151 F.3d 970 (9th Cir. 1998) — 36

U.S. V. St. Clair, 855 F.2d 518 (8th Cir. 1998) — 36

Burton V. Johnson, 948 F.2d 1150 (10th Cir. 1991) — 36

Gargle V. Mullin, 317 F.3d 1196 (10th Cir. 2003) — 47

People V. Ledesma, 43 Cal. 3d 171, 729 P.2d 839) — 18

People V. Pope, 23 Cal. 3d, 412) — 18

People V. Slocum, 1975, 52 Cal. App. 3d 867, 125 Cal. Rptr. 422) — 21

People V. Viaza, 1966, 244 Cal. App. 2d. 121, 52 Cal. Rptr. 733) — 21

People V. Podwy's, 6 Cal. App. 2d) — 23

People V. Pitts, 273 Cal. Rptr. 757, 223 Cal. App. 3d 606) — 23

In re Carpenter, 1995, 9 Cal. 4th 634, 38 Cal. Rptr. 2d 665, 889 P.2d 985 — 33

## TABLE OF AUTHORITIES

"Pages"

People v. Holloway, 1990, 50 cal. 3d 1098, 269 cal. 530, 790 P. 2d 1327)    33

People v. Castro, 1986, 184 cal. App. 3d 849, 853)    34

People v. Windham, 1977, 19 cal. 3d 128)    52

In re Antazo, 1970, 3 cal. 3d 100)    57

Westbrook v. Mihaly, 1970, 2 cal 3d 765)    57

D'Amico v. Board of Medical Examiners, 1974, 11 cal. 3d.1)    57

California Penal Code § 977 Subdivision (b)    55, 56, 58

California Code of Civil Procedure . 237(b), (d), 206(g)    30

## TABLE OF EXHIBITS

Exhibit –(1). Two pages request by jury

Exhibit – (2). Six pages 911-call by Ovation Clothing

Exhibit- (3). Two pages jury#4 interview by Investigator Paul Perez

Exhibit- (4).Ten pages notice and evidence to support timeliness

iv



Sherman Davis D-40369.
CSP-Corcoran Prison (4B2L-1)
P.O. Box 8800
Corcoran, CA. 93212

"Legal"

TO: United States District Court for the Northern District.
U.S. Courthouse
450 Golden Gate Avenue
San Francisco, CA. 94102-3483

PRIORITY
MAIL
www.usps.com

RECEIVED
APR 11 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA